Telephone v. Sprint, and I understand that the order the parties have agreed to is that Mr. Simeon was going to argue first, and then we will be hearing from the amicus. Is that the order? Four minutes of amicus, and then we'll proceed to Mr. Lockerbie on that. Okay. Mr. Simeon. Thank you, Your Honor. May it please the Court, my name is Tim Simeon, representing Sprint. I thought I'd start by briefly addressing the statutory exhaustion issue that was in the latest flurry of briefs, and then turn to our prudential exhaustion argument, and finally to the merits. You want to speak up just a little. Sure. With respect to statutory exhaustion, we made two arguments in our opening briefs, a Chevron Step 1 argument that the text and structure of the statute require exhaustion, and a Chevron Step 2 argument that the FCC's star power decision filled any gap in the statute. As we said in our brief on Friday, this Court should defer to the FCC on the Chevron Step 2 argument if the Court gets to it. We don't think the Court needs to get to it because, again, we think that the statute imposes an exhaustion requirement here at Chevron Step 1. Now, we certainly acknowledge that some courts have found the statute to be ambiguous, but as we explained in our brief on Friday, we think that looking at the text and structure of the statute as a whole, that's just not true. But you acknowledge there is no specific statutory exhaustion requirement? No. Your argument requires us to read it holistically and perhaps fill in some gaps. I don't think there are gaps, but if I can maybe try to explain why I don't think there are gaps, and we can talk about whether there are. But my argument is we first really have to look at Section 252E6 as a whole. We also have to look at it together with Sections 207 and 208. So looking first at Section 252E6, there are two sentences to 252E6. And the first one says, if a state commission doesn't act under Section 252, then you have to go to the FCC with Section 252 issues. So that sentence says, in a case in which the state commission fails to act, the proceeding by the FCC under Section 252E5 and subsequent judicial review is commonly run. If you agree, the failure to act is a failure to approve an agreement. No, I don't think we do agree, Your Honor. No, you don't. You want this whole statute to go much beyond, I believe, what the statute addresses, which is the approval of agreements. I think I can say a few things about that, Your Honor. And the first is the FCC actually agrees with us about this. On page 10 in footnote 4 of their brief, they agree that the phrase, a determination under this section, a determination under Section 252, includes a determination, an interpretation of the meaning of an ICA as opposed to only decisions about approval or rejection. So the first thing I would say is if the FCC gets deference on construing the statute. That doesn't add much because it seems to me you have arbitrations, you have mediations, you have a process for approval and there have to be interpretations and constructions in this process. Yes. And you have a list of specific acts that are being addressed in 251 and 252, which is basically to get this interconnection agreement system in place. Now the question comes, if that is the role of those two sections, is to get an agreement in place, either encourage the negotiated agreement or have a compulsory arbitration, then we're asking the state commissions to approve it. And if they don't, the FCC will. The question then comes is now you have this system in place and you have a complaint by one of the parties as to what the agreements mean. I'm not sure that's a close adjunct. What was it, the Fifth Circuit or somebody read that as a pretty close adjunct. I'm not sure it is in the larger scheme of things. If you look at the whole Telecommunications Act and see what the role of the FCC and the role of the state commissions is, it's very carefully carved out as to what is being done. And it's pretty clear that the act wants the state commissions to approve these interconnect agreements and get them into place, however done. It doesn't necessarily follow, it could follow, but it doesn't necessarily follow that once they're in place, they want the state commissions to administer the system that's been put in place. And that's another question which they should be addressing these days. I don't know if they are. Do they have something before them? Not on the question whether an interpretation of an ICA. That's too general a term. An interpretation of an ICA can be under any, it could be on breach of contract, it could be an approval of a contract. The real question is what is the, what are the state commission's role here? And the state commission's role is singly getting the interstate connect agreements in place. And the question is if they don't act as they're authorized to do, we have of course the, you know, the normal federal state problems and we're not mandating the state to do that. If they decide not to do it, then the default position is the FCC will do it. So that's what that first clause basically says. And then it says any determination fairly lacked, but then any determination is reviewable in court. Okay, so I think we do disagree about the scope of the word determination. No, I'm not. Which, in which context? I understood Judge Niemeyer. In E6? Yes, in E6. Okay, so we, but we agree though that at least facially, the statute facially limits the role of state commissions to either approving or rejecting an interconnection agreement. No. By its terms. I don't think, I don't think it says that the state commission can't do any more. It authorizes the state commission to do those things. It specifically authorizes state commissions to approve or reject. Yes. And if they don't, there's this default mechanism to the FCC. Yes. And if they make a determination, any party agreed by that determination can go into federal court. Yes, Your Honor. What from that language in your view makes the state commission determination a precondition to any action post-approval of the interconnection agreement? So, first of all, we need to read the word determination to include post-approval determinations, right? Well, if we did, it only says in any case in which. Well, that's a separate question. I'm sorry? It defines a determination under this section. I'm not sure I'm following your point. The determination is cabined by the words under this section. Yes. In any case in which a state commission. Let me address, what is a determination under Section 252? I think that's the argument that we were just having. I think, so Verizon Maryland 2, this court's decision of Verizon Maryland 2 was about the question whether an interpretation of an ICA arises under federal law or whether it's a contract issue under state law. And this court held it's a federal, it's an issue that arises under federal law. So what federal law does an interpretation of an ICA arise under? It arises under Section 252. That's where ICAs come from. So I'm saying. Actually, it's broader than that. Was this Judge Michael's opinion? This is the opinion from which you dissented actually saying this isn't a determination under Section 252. And the majority disagreed. But the point is what law is applicable, the whole Communications Act is federal law. Yes. It acts under a preemption. And it confers back to the state's authority, the Commission's authority to act in specified areas. But the specific issue in Verizon Maryland 2, as opposed to Verizon Maryland 1, which was a preemption issue that the Supreme Court found the district courts had jurisdiction over under Section 1331. But that's a different question than federal law. You're now switching gears. We were talking about whether it's federal law. Jurisdiction is another issue. I'm here talking about does an interpretation of an ICA arise under Section 252? Is it a determination under this section? Of course it does. Okay. Well, so it's a determination under this section, under 252E6. That doesn't mean it entertains a breach of contract case. I'm sorry? That doesn't mean it entertains a breach of contract case. An interpretation has to be made in carrying out these functions specified. You have to be more specific than using the general term construing language. Of course they have the power to construe. They have a lot of conduct here that's directed to them under 251 and 252. And that's exactly what it says. It says in any case in which a state commission makes a determination under this section. Now we have to find out what the determinations under this section are. And they include interpretations of ICAs. Of course. But in connection with its functions of approving. Well, and also interpreting under Verizon Maryland too, right? I know, but that doesn't get you a breach of contract case. I mean, can't you understand that you have to interpret also when you're performing the other functions actually specified here? I'm actually not sure I am following your argument, Your Honor. Well, in reaching a conclusion I would imagine you like, the Third Circuit relied on star power. And the FCC has clarified its view that the Third Circuit's interpretation of star power is inaccurate. Right. So the FCC should get deference if there's an ambiguity in the statute. I was arguing that there's not an ambiguity in the statute. Even the Third Circuit, as I recall, didn't go that far. It said it was silent. It said that the Telecommunications Act was silent as to procedures for post-formation disputes. That's correct. And we disagree with that. But I think it would be more productive at this point to move on and talk about the prudential exhaustion argument. I think you're probably right. It doesn't appear to me that I'm going to win that argument with Your Honors. Turning to the prudential exhaustion. Don't reach conclusions too quickly. I mean, you may be more persuasive than you think. Well, I also have very limited time. This is a very complicated case. I'd love to have a chance to talk about the merits. On prudential exhaustion, the district court said if there's no statutory requirement of exhaustion, well, then there can't be a prudential one. The district court said, this is quoting, where Congress has not clearly required exhaustion, courts do not possess the discretion to decide as a policy matter whether exhaustion would be a desirable requirement. Is this where you get to tell us that federal courts are simply lacking the expertise to make such determinations? No. And that the district court was just confused? No. This is where I want to say that if, as a prudential matter, a district court judge, if the judge knows that the judge has discretion to either send these types of cases to the state commission or to decide them him or herself, that's one analysis. The district court here didn't know. If I may, that decision would be subject to an abuse of discretion standard? Yes, it would. But imagine a situation under the sentencing guidelines. If the judge doesn't know that the judge has discretion to depart, then usually you send that back and the judge actually, with the knowledge of his or her discretion, makes the analysis. Here, there was no analysis. Why would the district court have discretion to give a state commission, this is federal law, to give a state commission a function that Congress didn't give it? If it concluded, I'm assuming now, hypothetically, that it concludes that the functions under 251 and 252 are to approve these agreements. Yes. And the question is, should we also give the commission's authority to construe the agreements when there's a dispute later? I don't think there's any disagreement, Your Honor, that state commissions have concurrent authority to interpret ICAs. They may not have exclusive authority. The question was too broad to say interpret. They get rate matters. They get the traditional telephone matters that were originally committed to them under the Communications Act. These things, to say the issue is construe, the whole judicial function is to construe. It seems to me you've got to ask a more specific question. Do they have an authority to handle breach of contract cases? Do they have authority to approve this? Do they have authority to set rates? Do they have authority to authorize new persons, facilitators? I guess maybe part of what I'm not understanding is that under Verizon Maryland 2, and a construction of an ICA isn't a breach of contract case. It's an issue of federal law arising under the Telecommunications Act. And you can file it in federal court. You can file it in federal court. And you can take it to the state commission. But where's the authority for that? That's my point. In other words, you're suggesting that because the state commission exists under the Telecommunications Act, the state commission somehow, the federal courts can pick when to go to the state and not. Except that if you look at the overall structure, and you remember the 1934 Act and what the 1996 Act did, the idea was to give the state commissions a role defined by Congress. Well, and every court to consider that issue has decided that that role includes interpreting ICAs that they have approved and are arbitrated. And where do you get that from? You have to get it out of 251, right? Well, Section 252E6 says when a state commission makes a determination under this section. Right. What are the determinations? Tell me what you think the determinations, the statutory determinations are. Well, it's not just what I think. The FCC thinks that those determinations. I'm asking you what you think, what your argument is that this statute authorized, what determinations are authorized? As a number of courts, including the 11th Circuit and the 5th Circuit have found, Congress's delegation to state commissions of authority to arbitrate and approve agreements included an authority to say what those agreements mean after they've been arbitrated and or approved. But it doesn't, for your argument, though, the fact that there may be concurrent jurisdiction isn't the end of the inquiry, is it? No. And all I'm saying in the prudential exhaustion argument is to the extent that the state commissions have acknowledged concurrent authority, it would serve the purposes of the prudential exhaustion doctrine for a district court judge who knows he has discretion to send it to the state commission to go ahead and do it. But the district court chose not to. He did not have discretion to send it to the state commission, but he did. That's the point on which we'd like reversal with respect to prudential exhaustion. We would like this court. You do not want to reach the issue of whether there was an abuse of discretion. You want a review on whether there is discretion. We think this court would clearly have authority to reach the question of whether the purposes of the prudential exhaustion doctrine would be served by sending these issues to the district court. But we don't need that in order to get a reversal on the wrong standard issue. Let me turn to my question. And I must say it's a stumbling block because the answer you've given me a couple of times to this is the authority to approve includes the authority to construe. Again, though, it's not my answer. It's the FCC's answer, the Eleventh Circuit's answer, and the Fifth Circuit's answer. Well, I have to start with the statute. And if we disagree with the Fifth Circuit, we'll disagree with the Fifth Circuit. But the question in my judgment is, and I'm not speaking for anybody here, but the question in my judgment is whether there is authority for the state commissions to handle breach of contract claims or declaratory judgments that are surrogates for breach of contract claims. By breach of contract claim, how does that fit in with the Verizon Maryland 2 decision? I read Verizon Maryland 2 as saying an interpretation of an ICA is an interpretation of a creature of federal law. But how does they get an interpretation? In other words, it is federal law. And I think the question is – It's federal contract. I guess I just don't know what Your Honor means. The question is, what does it mean to construe? And you add nothing to saying they have authority to construe under this. Because every one of these functions, when they're approving it, they have to construe it. They have to understand what they're approving. And if they approve it, they understand the contract. Approving it is not saying what it means. And Verizon Maryland 2 was about saying what it means, not about approving. Well, sure, but it may be that it's ambiguous and they have to make a construction in approving it. But my point is, the question is, let me get a more direct hypothetical. Okay. Their billing, not hypothetical in this case, under the agreement that's been approved, one party charges the other party incorrectly, according to the other party. And they have a dispute over the billing of that agreement. So one side has a breach of contract claim. The other said, no, I'm justifying. So you can bring that as a declaratory judgment action under traditional common law, or you could bring a breach of contract claim. But in either case, it involves an administration of an ongoing contract where one party is not following the terms of the contract. And the relief is a declaratory judgment or whatever the relief can be entered. But my suggestion to you is just because somebody uses the word construe doesn't mean that that type of case is necessarily handled as a determination. The determination is once a contract is fully approved and in place, does 251 grant the state commission authority to administer that when there's a dispute? And that's a question that has been repeatedly addressed since the passage of the act. Including in Verizon. Including in Verizon Maryland too. And the answer is yes. I see, you know, my time is up. I would love to talk a bit about demerits, but only if it would be helpful to the court. Well, it would be. Why don't you take three more minutes, and you can give them three minutes, and you can quickly take your most important points. Okay. So really Sprint's main argument below on the merits was that the scope of the ICAs here is limited to exchange of traffic from one local exchange network to another local exchange network. So before the 1996 act, of course, there was only one local exchange network in a given area. There was no local competition. And that network connected to a bunch of long-distance networks. And it connected to a bunch of long-distance networks using something called feature group D trunks. It's just what you call a connection between a local network and a long-distance network. So once there was competition under the 96 act, we needed anyway. I have trouble following the technology of the lines. I'm wondering why a particular line over which data is going, electrons are flowing, why it can't be both local and interstate, I mean long-distance. What we're saying is that it can only either connect one local network to another local network or connect one local network to a long-distance network. It doesn't do both. That was my question. Why can't it do both? Or does it in reality do both? That's actually a very good question. The same type of trunk, if we use this sort of metaphor of trunks being like pipes, the same kind of pipe can connect one local network to another local network or one local network to a long-distance network. It's the same pipe. But Sprint's argument here turns on the function of that pipe. Is it doing the function that ICAs cover or is it doing something else? So feature group D is just what you … Let me just ask you, just starting right there. Yes. The pipe between two local networks. Yes. Could that pipe also be a pipe that is branched and connecting from the center of the pipe, connecting to a long-distance? I don't believe so, Your Honor. A trunk ordinarily is either serving as a local interconnection trunk. It's either a particular piece of pipe is either connecting one local network to another local network. Here. The reason I ask this is because long-distance was always an interesting question is what is long-distance. And so you have a local network and then you have three houses that are right beyond the reach of that. They're long-distance. And they're reached by a line. I don't know where the line goes. But next year, they're pulled into the system and now they're local. This happened. This is enormously complicated, but let me give it a quick shot. Right. In the telecom world, you have something called a local calling area. If you imagine your phone at home, a geographic area about 13 miles around your phone is the local calling area, and there's no toll to call within that area. Bigger areas are called local access and transport areas. They came around after the breakup of AT&T because Bell operating companies could only provide service within that local access and transport area. Ladders. Ladders, our friends' ladders. So what you're referring to is a situation where a call goes from one local calling area to another local calling area, but within the ladder? Well, Bell operating companies were allowed to provide that service. And for these purposes, that's actually not long distance. That's actually something that happens over the local exchange network. Now, what if it goes a few miles beyond the ladder? Okay. Long distance? Yes. But isn't it going over the same lines? No. So let me give you a very simple example of this. If somebody in North Carolina wants to call a CenturyLink customer here in Richmond, they do it on an old-fashioned rotary phone like we all had as kids. That call goes from the phone to the local switch. And if Sprint is the long distance company, it's handed off at the local switch to the IXC to Sprint. So then it's delivered over something called a feature group D trunk, a long distance trunk, to CenturyLink here in Richmond, and CenturyLink terminates it. Okay. Make the same call by a cell phone operator in Century here. You have a cell phone operator from a different operator and, say, an AT&T and a Century right here in Richmond. So what ordinarily within Richmond, if it's a local call, it stays on CenturyLink's local network. There's no point in it. What if the telephone is registered in Baltimore, and I brought it down here, and I dialed here locally? In the wireless world, that call would actually be handed off to long distance and would come to the local network here and be terminated. But let me give you a simpler example that really matters in this case. If we go back to my rotary dial example from North Carolina, if we take away that person's rotary dial phone and give them a fancy new Sprint VoIP phone, and they make the exact same call, also using Sprint as the long distance company, the call looks exactly the same. It goes from the fancy phone to the local SELAC switch. It's handed off to a long distance company. It comes here to Richmond where it's handed off to CenturyLink and terminated. Both of those calls, the long distance wireline call and the long distance VoIP call, are delivered to CenturyLink over a feature group D trunk because they come from the long distance network. So basically what CenturyLink is saying here is if it's a wireline call, that call is subject to the federal tariff regime. But if it's a VoIP call, the same call over the same line, it's actually subject to the interconnection provisions of the ICA. And the strange thing about this is... Could you address in that regard 37 what your response is to the language on... Yes, actually I would love to address what my response is to 37.1.2 because this is where the whole thing goes off the rails. 37.1.2 is about something very specific. It's about equal access traffic. Now what the heck is equal access traffic? Equal access traffic has to do with the fact that a CLEC is not allowed to make its customers use its own IXC. So the Sprint CLEC can't say you guys have to use the Sprint IXC. Equal access means that the customer gets to choose the IXC that the customer wants to use. But a local CLEC network like Sprint doesn't have points of interconnection with all those different long-distance carriers. What a local CLEC like Sprint does is it interconnects with the ILAC. And over an equal access trunk, it sends that long-distance traffic over a local interconnection trunk from the CLEC to the ILAC. And then the ILAC has points of interconnection with all those other IXCs. So what 37.1.2 is about is under the interconnection agreement, there's exchange of long-distance traffic from one local network to another local network. It's long-distance traffic, but that traffic has to get from the Sprint CLEC VoIP phone to that other IXC that Sprint doesn't have an interconnection with. So equal access traffic is a very specific thing that has nothing to do with the situation where the Sprint CLEC customer is using the Sprint long-distance company. When the Sprint CLEC customer uses the Sprint long-distance company, of course Sprint hands that call off to the Sprint long-distance company. And if it happens to come to Richmond, the feature group D trunk, the long-distance trunk delivers that traffic to CenturyLink here in Richmond. But what Sprint is saying is ICAs are only about the exchange of traffic from one local network to another. So inter-exchange traffic, long-distance traffic on these 37.1.2 trunks is absolutely covered by the ICAs. What's not covered by the ICAs are calls like the one from the rotary dial phone, which is covered by the federal tariff regime, and calls from the Sprint VoIP phone, which is covered by the federal tariff regime. Is the distinction made by reason of the data that's going over VoIP versus something else? No. Or is it based on the user? The distinction has to do with the networks. So basically ICAs, which came along after the 1996 Act, are entirely about connecting one local network to another local network. The district court thought that Sprint was arguing, well, that inter-exchange traffic, that long-distance traffic isn't covered. That's not what we're arguing. We're arguing that when traffic goes from the Sprint local network to the CenturyLink local network, it doesn't matter if it's long-distance or local or local toll. All that's covered by the ICAs. What the ICAs don't cover is the stuff that existed before the 1996 Act even came along. The ICAs don't cover connections between long-distance networks and local networks. So what we call featured deep trunk. And what's Sprint doing now? Is Sprint billing you for? CenturyLink is billing us only for, or was at this time, only for the VOIP traffic that comes over the featured group D line. When that's a rotary dial phone coming up from North Carolina, the exact same call, delivered in the exact same way to the CenturyLink local network here in Richmond, they agree, oh, yes, that's absolutely under the federal tariff regime. But when it happens to be a VOIP call, they say, well, you agreed in the interconnection that VOIP calls would be treated the same as voice traffic. But this is the very strange thing about their argument. They point to Section 38.4, which says that VOIP traffic is supposed to be treated just like voice traffic. They point to that provision to say that the VOIP traffic on the featured group D line should be treated differently from the voice traffic on the featured group D line. It's a bit of a non sequitur. I'm so far over my time I don't even know what to say. But I'd love to talk about North Carolina maybe on rebuttal. You've reserved some rebuttal, and we probably could use a half a day on this. Thank you. I fear we all could. Thank you. Mr. Unstreich. Thank you, Your Honors. Scott Unstreich for Amicus Verizon. I'd like to make three brief points in my time. First, there is no statutory exhaustion requirement. Section 252E6 does not speak to exhaustion. No court of appeals has held that it does. And three courts of appeals, the First and Second Circuits in the GlobalMaps cases and the Third Circuit in the Core Communications case have squarely held that it does not. Sprint is asking this court to create a circuit conflict with no basis in the statutory text for disagreeing with all of the other circuits to have looked at the issue. As far as prudential exhaustion goes. Well, stay back with that one a minute. What do these cases that say the ability to construe an agreement is within the approval? Sure, Your Honor. Judge Duncan, if I could answer Judge Niemeyer's question. It was sort of part of. Okay. But go ahead. So Your Honor has asked Mr. Simeon a number of times about where a state commission gets the authority to hear a breach of interconnection agreement claim. And I think, Your Honor, in your dissenting opinion in the Verizon Maryland 2 case, and it's at 377F3rd, 379, notes that courts of appeals have either found that authority as being implicit in Section 252 and the delegation of authority to approve or reject the agreements, or those courts have deferred to the FCC's determination in star power that there is an implicit delegation. Have there been any courts that I didn't really understand to be open to question. I mean, I thought most of the courts who have considered it, including Bell South versus MCI Metro, for example, the question really isn't whether the state commission could. The argument is whether it has to.  And a good summary, 603F3rd, 83 footnote 12. The First Circuit does a good summary of those circuit courts that have confronted the issue and have held, again, either finding it implicit in Section 252 or deferring to the FCC in star power, found that state commissions could do it. The First Circuit lists decisions from a number of courts. The First Circuit, however, itself has not addressed that issue. This court did not decide that issue in Verizon Maryland. But no circuit court, again, other than Your Honor's decision in Bell Atlantic, which was vacated by the Supreme Court for other reasons, has actually reached that issue and come out the other way. So, yes, the statutory question is whether it must. And, again, there is no Congress just did not take breach of contract claims away from the federal courts to the extent they fall as Verizon Maryland to help within Section 1331. So then the question becomes, well, could the court create a prudential requirement? And contrary to Mr. Simeon's claim, the district court was not confused. The district court expressly found, and this is at pages 49 to 50 of the joint appendix, that holding that there is no or should be no exhaustion requirement honors the text and scheme and is consistent with the court's obligation to exercise jurisdiction where it's found to exist. And the court went on to consider primary jurisdiction. But I think his point was it's not a discretionary decision that we review for abuse. This is a legal question as to whether the court could send it back. And his argument is that, disagreeing with the district court, that a court could send it to the commission. It has authority to do so. And I guess my point, Your Honor, was that the district court was fully aware that it had authority to send it to the commission either by. Does it have authority? Under the primary jurisdiction doctrine, absolutely. And Sprint waived any primary jurisdiction doctrine. It made a primary jurisdiction argument to the district court below. It waived it on appeal. This may well have been the kind of case that should have been sent because it's complicated and technical, as we heard from the explanation of how calls traverse the various networks. But if the question is, should, in the absence of a statutory requirement, should the court create a prudential exhaustion requirement, then I think here one has to look to the agency that's charged with administering the statute. And the agency here doesn't think there should be a prudential exhaustion requirement. The agency here thinks that parties should be free to write forum selection clauses in their contracts. They think that multi-state adjudication in a single forum makes a lot of sense and is pro-competitive. And so adopting a judge-made rule of exhaustion, which would be waivable and arguably was waived here anyway, would be contrary to the FCC's own views about the best administration of the scheme. I see my time's up. Yeah. All right. Thank you. All right. Mr. Lockerbie. Thank you. May it please the court. Mike Lockerbie representing the 19 plaintiffs' appellees that are referred to collectively as CenturyLink. As much discussion as there's been in the briefs and in court this morning of Section 252E6, I think it's important to bear in mind that CenturyLink did not assert any claims under Section 252E6. And in fact, given the procedural posture of this case and the history of the parties' ICAs, CenturyLink could not have asserted any claims under Section 252E6. The reason is clear. CenturyLink is not and was not a party aggrieved by a state commission approval or rejection of an ICA pursuant to Section 252E1 or 252E6. I'm sorry, E2. There was simply no basis for CenturyLink to have asserted a claim under that statute. By seeking dismissal on what it calls jurisdiction. Well, that's sort of stating the obvious. I mean, they're not claiming. The approval process is not at issue here. What's at issue here is how to construe an agreement that was approved, right? That's correct, Your Honor. Their argument is inherent in the approval process. It's also the right to construe what they approved in a later dispute. And there are two differences here, though. One is that the ICAs that the state commissions approved said that a party with a dispute could but didn't have to go back to the state commission for dispute resolution. So the party was free to seek resolution in any other forum. Who said that? The state commissions that approved these 18 ICAs. They approved a dispute resolution provision that says we can review or we can resolve disputes. That's a contractual provision? Well, it's a contractual provision, but it's more than that because it's a contractual provision that was approved by the state commissions pursuant Why is it more than a contractual? Well, because now that it's part of the ICAs, it's federal law. Well, of course, but the ICA is an agreement. It isn't. And we look at the agreement and decide whether the agreement's being followed or not. You're saying that within those agreements, there is a provision that the parties have agreed that an aggrieved party can go either to the commission or to court. That's correct. And really, if anyone should have brought a claim under 252E6, perhaps it's Sprint because it's arguing now nine years after the fact that It's really arguing noncompliance, isn't it, with the ICA that the commission approved? No, it's actually arguing, I think, it's hard to tell because the argument's a moving target, but I think what Sprint is arguing is that somehow the state commissions shouldn't have said you can go somewhere else for dispute resolution other than to us. They're challenging the dispute resolution provision of the ICAs, which says that you can go anywhere. Well, I thought the question was addressed if you have a dispute on the merits. In other words, the billing or the not handing off calls or whatever, misdirecting calls. In other words, anything in violation of the ICA. That question has not been resolved by a court or the commission, has it? It's just the contractual provision there that's been approved. The contractual provision that's been approved, that's correct. And this also is not a case in which the state commissions needed to be asked what they meant by one unambiguous sentence in 18 ICAs. We're talking about one sentence that Sprint drafted that is clear on its face. So there was clearly no requirement under the statute that CenturyLink take this claim to the state commissions. And we would respectfully submit that by seeking dismissal on jurisdictional grounds, what Sprint is really trying to do is to do an end run against two holdings. One is the Supreme Court's decision in Verizon Maryland 1, where Verizon Maryland 1 said that Section 252E6 does not divest district courts of their authority under 28 U.S.C. Section 1331. And the second decision is, of course, this court's decision in Verizon Maryland 2, which Sprint's opening brief said had nothing to do with this case. The brief filed on Friday says that their argument is a logical conclusion from Verizon Maryland 2. In fact, it's not a logical conclusion from Verizon Maryland 2 because what Verizon Maryland 2 said is that if a contractual obligation is one of the essential duties under Section 251 of the Telecom Act, then that is a question of federal law over which the federal courts have original jurisdiction under 28 U.S.C. Section 1331 and Section 207 of the Communications Act. And really what Sprint is trying to do is divest the federal courts of their jurisdiction. Now, this argument that the court should have nevertheless required CenturyLink to go to 18 state commissions, calling that exhaustion is perhaps a Freudian slip because CenturyLink would have been required to go to 18 different commissions, and that's not even an argument. The only basis upon which the district court perhaps could have imposed such a prudential requirement would have been if Sprint had argued that the doctrine of primary jurisdiction required referral to the 18 state commissions. That's not what Sprint argued at the district court, contrary to what's been stated here this morning. What Sprint argued is that the doctrine of primary jurisdiction required referral to the FCC, and that's an argument that Sprint has abandoned on appeal, has not raised that argument as grounds for appeal. Could I, because of limited time, I wanted to get to the discussion about whether the interconnection agreements require the payment of access charges for voice over Internet protocol originated traffic in the district court's determination that Section 38.4 pretty much conclusively resolves that issue. That's, although there was discussion earlier by Sprint's counsel that it's a complicated issue, it's really not, because the simple truth is this is just another way by which Sprint is arguing that it should get something for nothing. And if Sprint's interpretation of the contract were true, there would have been no reason to negotiate these ICAs in the first place. For local traffic delivered over local interconnection trunks, the arrangement reflected in the ICAs was bill and keep. In other words, there's no billing at all. So to suggest that the parties negotiated these contracts so that Sprint wouldn't have to pay access charges makes no sense. It's contrary to the plain language of the contracts. It's contrary to the party's course of dealing. And it's contrary to a series of findings of fact that the district court made that I'll walk through in a minute. What's important also is the record is clear that there were contracts that Sprint entered into at this same time, where it sought to limit the scope to local traffic delivered over local interconnection trunks. In other words, to exclude feature group D. One of those contracts was with Level 3 Communications in Kansas. And that had express language in it that said the scope is limited to local interconnection trunks. Now, counsel for Sprint said that Section 251 was limited to interconnection of local exchange networks. Two points there. One, of course, it amended a preexisting federal statute that already required interconnection of long distance. But more importantly, nothing in 251 prohibited parties from entering into ICAs that were broader in scope. And that's exactly what happened here. These contracts were not one-way contracts. They governed the exchange of traffic. And so there was traffic that CenturyLink delivered to Sprint, or more accurately, to cable companies, for which Sprint was a wholesaler, for termination on the cable company's local networks. For example, if somebody was a Time Warner cable subscriber in North Carolina, CenturyLink might deliver that traffic. Sprint billed CenturyLink, under the ICAs, access charges for the termination of that traffic. And that happened throughout the course of the contracts. Sprint billed CenturyLink, and CenturyLink billed Sprint the exact same way. And this argument that the contracts didn't cover traffic delivered over feature group D trunks is not something that Sprint even raised when it disputed these invoices five years after the fact in 2009. It was an argument raised for the first time in the district court, never raised in the ordinary course of dealing. And there are numerous provisions of the ICA that would have been totally superfluous if that really were the party's intention. And we lay them out in the brief. There even is a hypothetical ICA that is in the joint appendix at section, joint appendix page 231, where we basically cross out all of the various provisions of the contracts that would have been superfluous if they were really meant to do what Sprint says. It is also not true that these contracts didn't cover voice traffic or traditional voice traffic, if there even was any. You know, for one thing, it was not, and this is in the record, CenturyLink had no way of knowing whether a call originated in the traditional TDM or voice format, because by the time it got to CenturyLink, it had already been converted to the same format. Moreover, Sprint doesn't have local exchange networks in North Carolina or anywhere else, at least nothing to speak of. Sprint was acting as a wholesaler for various cable companies. So all the traffic, or virtually all the traffic, was originating in VOIP. That was the whole reason for these contracts. But, in fact, the contracts didn't distinguish, and they didn't say that traditional voice traffic is covered by tariffs, VOIP traffic is covered by the ICAs. No, they said all traffic is billed at the tariff rates. You know, we don't know how it originated. We don't know where it originated. Well, we do know where it originated, and we bill based on the endpoints of the call. So if it's interstate long distance, you pay the long distance, the interstate tariff rate. What, besides being contrary to the course of dealing of the parties, the interpretation that Sprint is arguing is contrary to a number of findings of fact that the district court made. And a lot of the evidence is on the record. And, of course, the course of dealing and the district court's findings of fact are only relevant if the contract were somehow ambiguous and the district court found that it isn't. But if the contract were ambiguous, then the district court's findings of fact could be set aside only if they were clearly erroneous. And they were not. For one thing, Sprint admitted at trial that if it, under its interpretation of the contract, it could have easily simply switched traffic to different trunks to avoid the payment of access charges. And, in fact, there was evidence in the record that in some cases, and this is in the Joint Appendix 445, Sprint was able to deliver long distance traffic from its local interconnection trunks and its feature group D trunks to the very same CenturyLink switch. There was also evidence that the impetus for these parties was because Sprint's long distance division, the inter-exchange carrier division, that was the one that was seeking to offer wholesale services to the cable companies on behalf of various, in competition with other long distance carriers or IXC. So long distance service over feature group D trunks was the impetus for these contracts. The wholesale agreements with the cable companies obligated Sprint to arrange for the termination of VOIP originated traffic, regardless of what trunk it traveled under or traveled over. The purpose of the contracts was to terminate local and long distance calls. And, again, Sprint didn't have any VOIP customers of its own. Rather, they were customers of the cable companies. Most of the traffic, the VOIP originated traffic that was the impetus for these contracts, was delivered over feature group D trunks. And that's why this new interpretation that Sprint has adopted would get its payment obligations down to nearly zero. There also was extensive testimony at trial about the so-called one Sprint policy, where at that time these plaintiffs and what are now the defendants were part of one company. And because these were contracts that any other carrier could opt into, they had to be fair and balanced. And they really reflected a golden rule approach to interconnection. But they also reflected a concern about maximizing revenue to Sprint Corporation as a whole. And at that time, if these local companies had simply agreed to hand over their networks to Sprint for nothing, both the local companies and the Sprint parent would have lost a significant amount of revenue. And so the one Sprint policy on VOIP compensation, and it's in numerous pieces of prepared testimony that Sprint submitted to public utility commissions, it's in the ICAs, was that VOIP traffic would be compensated the exact same way as voice, traditional voice traffic. You look at the endpoints of the calls and if access charges are due, you pay them. And that was to maximize the revenue to Sprint as a whole. Finally, this argument that using the phrase local interconnection network somehow means that there was an intent to exclude feature group D trunks. Again, their contracts were Sprint did that. This is not one of them. But also, one of the state commissions that approved these ICAs, the Florida Public Utility Commission, has a definition of local interconnection that says that it simply means linking two networks. And if a carrier doesn't pay access charges pursuant to an interconnection agreement, that's a violation. And so the Florida Commission didn't agree with Sprint either. I see we're almost out of time. And so before concluding, I wanted to see whether the court had questions about some of the other arguments that Sprint has raised as grounds for appeal. We didn't really get to them in Sprint's direct argument. All right, thank you, Mr. Lockerbie. All right, Mr. Simeon. Boy, I don't know where to start. I guess one point I'd like to just very quickly make is the agreement provision about dispute resolution is really a red herring. It says parties agree that any dispute arising out of or related to this agreement that parties can't resolve may be submitted to the State Public Utilities Commission for resolution, and it goes on, and it concludes this provision shall not preclude the parties from seeking relief available in any other forum. So we don't argue that this provision is what precludes them from seeking relief. We argue that there ought to be a prudential exhaustion requirement. You don't argue that they're precluded from seeking relief in federal court. Your position is that there should be state commission consideration first, as I understand it. Yes, and we also argue that our argument isn't based on this provision. We don't say that it precludes them. The other point I want to make about prudential exhaustion is the district court- My point was the suggestion that that provision should be read to authorize federal court in the first instance. Yeah, I really don't understand his argument there, because what the provision says is that you can go to the state commission in the first instance, which is really kind of the opposite of what I understand him to be saying. The last clause, that it shall not preclude, it's in the negative. Right, so this provision shall not preclude- Even though this provision says you can go to the state commission, this provision doesn't preclude you from going to federal court. And we argue there are other reasons you can't go to federal court. First. First, right. On the question of what the district court believed its discretion to be, it said courts do not possess the discretion to decide as a policy matter whether exhaustion would be a desirable requirement. It said if there's no statutory requirement, I can't impose a prudential one. That's just wrong. That's our argument on that point. With respect to the feature group D stuff, I think the only thing I want to add at this point is that about 18 percent of Sprint's traffic that it delivers to CenturyLink over feature group D trunks is VoIP traffic. All the rest is wireless or wireline. As to all the rest, CenturyLink bills Sprint under the federal tariff regime, which is the regime that applies to the exchange of traffic between long distance networks and local networks. And finally, you know, with great respect for the abilities of federal courts, we really do think that this kind of issue belongs in the first instance before the state commissions. To say to a state commission that an interconnection agreement covers the exchange of traffic between a long distance network and a local network would sound crazy. State commissions know this stuff inside and out, and you don't have to explain to them what a feature group D trunk is and what it does. So when we say that there ought to be a prudential exhaustion requirement that these things go to the state commissions first, it's because state commissions live and breathe these issues. And when we tell them about them, they, you know, we don't have to talk to them about network architecture. So that's my final point is that there are very good reasons why these should go to state commissions. You're making a prudential argument. Wouldn't it be to argue for the FCC to hear it first as opposed to the state commissions? No, the way that the statute is actually set up, Your Honor, in our view, is that Congress wanted one of the expert agencies to rule on these issues. The FCC is absolutely entitled to hear these issues under Section 208. We have no problem with that. We completely agree with the FCC that you could take these issues to the FCC under Section 208. All we're saying is that before you can get to the federal courts under Section 207, there is either a statutory, and we talked about that, our view is that 252E6 says, you know, when there's been a determination by the state commission, then you can go to district court. This is like saying, you know, when you eat your dinner, you can have dessert. We think you have to eat your dinner in order to get dessert. But if we're wrong about the statutory argument, then we think that there is a prudential reason, that the purposes of the prudential exhaustion would be served. Have these issues been taken to commissions generally or across the country? Very broadly, Your Honor. As a general, the most common thing to happen to this kind of issue is that it goes to the state commission first. This is post-approval? Yes, Your Honor. This is what all the, you know, again, every case to consider whether state commissions have concurrent authority to hear these cases has decided that they do. And that's where these cases go. But if we conclude that the district court appreciated the possibility but really thought that it had jurisdiction, then? Yes, I think that would be very hard to conclude in the face of the statement that courts do not possess the discretion to decide whether there's, you know. Although that's a fairly unremarkable proposition generally, that federal courts are required, absent some extraordinary circumstance, to exercise the jurisdiction that they have. Well, but what a prudential rule is, right, is a rule that even though the court has jurisdiction and even though the plaintiff has a cause of action, there's still a rule of judicial administration. For example, suppose it were prudential standing instead of prudential exhaustion. It may be that suppose an environmental group came into the court under Section 207 and said, you know, we want to complain about something that a telecommunications company is doing. The court might very well find that that's not within the zone of interest of Section 207 under the prudential standing rule. We're saying prudential exhaustion is similar. The court has authority to go forward. It isn't because the latter example doesn't go to the power of federal courts and the obligation of federal courts to hear disputes under federal law. The implications are very different. I take your point, Your Honor, that as a kind of background rule, a federal court is supposed to go ahead with a federal case over which it has jurisdiction. I would say that the countervailing consideration here is that the general rule is that when there's an available administrative avenue for relief, the general rule is you're supposed to go there first. And then you can come back to the district court. It's not a question of whether the district court exercises its jurisdiction. It's a question of when. And we're saying this district court absolutely had Section 1331 jurisdiction. CenturyLink absolutely had a cause of action. All we're saying is that what makes sense here is to go to the State Commission first. All right. Thank you, Mr. Simeon. Thank you very much. We'll come down and greet counsel and then proceed on to the last case.
judges: Paul V. Niemeyer, Allyson K. Duncan, Henry F. Floyd